IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | Criminal No. 1:01-CR-71 |
| v. : | |
| : | (Judge Kane) |
| **FREDDIE SINKLER, JR.,** : | |
| : | |
| **Defendant** : | |

**MEMORANDUM AND ORDER**

Before the Court is Defendant's motion to suppress filed with the Court on May 7, 2001. (Doc. No. 14.) By Order dated July 27, 2001 (Doc. No. 31), this Court previously denied the Motion. Subsequently, the United States Court of Appeals for the Third Circuit vacated that Order and remanded the matter to this Court for further proceedings to consider whether certain narcotics and paraphernalia obtained during a warrantless search of Defendant's backpack were properly seized. The Court held an evidentiary hearing on September 8, 2004 to again consider the motion in light of the Third Circuit's remand Order.

**I.    Background**

Shortly after midnight on January 7, 2001, Harrisburg Police Officers engaged in a high speed chase with Defendant after Defendant refused to submit to a routine traffic stop in the area of Sixth and McClay Streets in North Harrisburg. The chase extended from city streets to Interstate 81 South and the rural countryside of the Cumberland valley. Several miles outside of the city, Defendant reversed course, proceeded over the grass median and continued north on Interstate 81 back towards Harrisburg. Eventually, Defendant caused the Jeep Grand Cherokee he was driving to cross the grass median into the southbound lane of traffic. At this point, Defendant lost control of the vehicle, which

turned sharply onto the driver's side and slid for several feet along the shoulder until it came to a rest along the side of the highway. Defendant was quickly surrounded by police officers who broke the Jeep's passenger window, dragged Defendant from the vehicle, and placed him under arrest.

Shortly after placing Defendant under arrest and securing him in a prisoner van, officers noticed a backpack located approximately fifteen feet behind the Jeep, laying in undisturbed snow. Officers proceeded to search the backpack within minutes of Defendant's arrest. After opening the backpack, police discovered drugs and drug paraphernalia, among other items. Defendant has moved to suppress the drugs and paraphernalia seized during this warrantless search of the backpack. In support of his motion, Defendant argues that the search was improper because (1) Defendant never abandoned the backpack; (2) the backpack was not searched validly incident to Defendant's arrest; or (3) the backpack was not properly searched pursuant to an inventory policy. For its part, the Government argues that the search was lawful under any of the three theories. The Court will address Defendant's arguments in seriatim.

**II.   Discussion**

**A.   Abandonment**

It is well established that police officers may search an item that has been abandoned by a suspect, because the suspect retains no reasonable expectation of privacy in an item he abandons. California v. Hodari D., 499 U.S. 621, 629 (1991) (upholding warrantless seizure of narcotics that defendant threw away while fleeing from police); United States v. Fulani, 368 F.3d 351, 354 (3d Cir. 2004). A finding that a defendant has abandoned property, and therefore relinquished any reasonable expectation of privacy, must be predicated on a finding that the defendant actually intended to abandon

the property. Fulani, 368 F.3d at 354. Accordingly, a court is required to determine objectively whether a defendant has abandoned property. Id. Proof of intent to abandon property must be established by clear and unequivocal evidence. Id. (citing United States v. Moody, 485 F.2d 531, 534 (3d Cir. 1973)).

The government was permitted to supplement the record on the issue of abandonment by virtue of the remand Order issued by the Third Circuit. At the outset of the September 8, 2004 hearing on this matter, the government acknowledged that no Harrisburg Police Officer would be able to testify that they observed or knew for certain that Defendant's backpack was thrown from the vehicle. (September 8, 2004 Transcript, at 6.) Instead, the government offered Defendant's admission that he abandoned the backpack through the testimony of Andrew Cunney, an agent with the United States Drug Enforcement Agency investigating Defendant and several other individuals involved in narcotics distribution. In particular, Agent Cunney testified that he held a proffer session with Defendant and his counsel on October 1, 2001, shortly after Defendant pled guilty to narcotics charges. (Id., at 11.) Agent Cunney further testified that during this proffer session, Defendant admitted to throwing the backpack out of the Jeep when he overturned the vehicle to end the January 7, 2001 chase. (Id., at 14.) Agent Cunney memorialized his recollection regarding Defendant's alleged admission in a draft report written shortly after the proffer session. (Id., at 11.) Agent Cunney also testified that "at some point" the parties executed a proffer letter. Although Agent Cunney could not attest to the particular terms of the proffer letter signed by Defendant, he testified that the standard terms of such proffer agreements prohibit the Government from using any of a defendant's statements against him in connection with the case-in-chief. (Id., at 16.) However, such statements can be used derivatively or

3

to impeach a defendant if he later testifies in a manner inconsistent with the admissions made during the proffer session. (Id.) The Government concedes that it cannot locate a copy of any such proffer letter and there is no documentary evidence that such proffer letter was ever actually executed. (Doc. No. 82.)

On cross examination, Agent Cunney conceded that during preliminary discussions he advised Defendant that the information he provided during the proffer session would help him and would not be used against him. (Transcript, at 21.) In this regard, Agent Cunney testified that he advised Defendant regarding potential statements that "none of this will hurt you unless you lie, and then it can eventually hurt you." (Id., at 30.)

Upon consideration of the arguments made by both parties, and consideration of Agent Cunney's testimony, the Court cannot conclude that there exists clear and unequivocal evidence demonstrating that Defendant abandoned the backpack or intended to abandon the backpack. It is true that Agent Cunney testified that Defendant abandoned the backpack, and the Court credits Agent Cunney's testimony and finds that Defendant made a statement that he abandoned the backpack. However, the Court also finds that the proffer agreement between the parties (whether or not written) precludes use of Defendant's statements in support of the Government's case-in-chief. The Court concludes that use of Defendant's admission that he abandoned the backpack is an attempt by the Government to use a Defendant's own admission as a critical piece of evidence in its case against Defendant, and is therefore tantamount to using such admission as part of the Government's case-in-chief. For this reason, the Court cannot rely upon Agent Cunney's testimony to conclude that Defendant abandoned the backpack.

The Government also offered testimony from Harrisburg Police Officers Chad Sunday and Christopher Delozier that would support an inference that the backpack was likely intentionally ejected from the vehicle. For example, the officers testified that the Jeep created a debris field as it crashed along Interstate 81, and testified that the backpack was located outside of this debris field. In addition, the officers testified that the backpack was located approximately fifteen feet from the vehicle, whereas other items of property contained in the Jeep either remained in the vehicle or were deposited underneath the vehicle following the crash. Notwithstanding this testimony, none of the Harrisburg Police Officers who were involved in the pursuit and eventual arrest of Defendant was able to testify that they observed Defendant tossing the backpack from the Jeep prior to his arrest. With all of these considerations in mind, the Court is unable to conclude that there exists clear and unequivocal evidence either that Defendant actually abandoned the backpack or that he had the objective intent to abandon the backpack and, accordingly, the Court finds that the seizure of the narcotics and paraphernalia from the backpack cannot be upheld under this theory.

**B.     Search Incident to Arrest**

The Government next argues that the search of the backpack was permissible as a search incident to Defendant's arrest.[1] Defendant urges this Court to suppress the search of the backpack because he claims it was not searched incident to his arrest, because such searches may extend only to

---

[1]     It should be noted that the legality of the initial attempted traffic stop and of Defendant's eventual arrest after his attempts to evade the police are not at issue. The Third Circuit concluded that no stop or seizure occurred when police officers first approached Defendant in the Jeep. United States v. Sinkler, 91 Fed. Appx. 226, 230 (3d Cir. 2004). Additionally, the Third Circuit held that the police officers "quite clearly" had probable cause to arrest Defendant "for a multitude of traffic violations, as well as assault of a police officer[.]" Id. at 231.

areas within an arrestee's control and which are immediately adjacent to where the arrest took place. In this case, Defendant argues that the backpack was located fifteen feet away from Defendant, was out of his immediate reach, and was searched after Defendant was handcuffed and secured by police. Accordingly, Defendant claims the search in this case exceeded the scope allowable for searches conducted incident to an arrest.

In connection with a lawful arrest, police officers are justified in searching "the arrestee's person and the area 'within his immediate control'– construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." Chimel v. California, 395 U.S. 752, 763 (1969) (invalidating search of portions of a house beyond the "area into which an arrestee might reach in order to grab a weapon or evidentiary items"). The Third Circuit has emphasized that such searches are subject to geographic and temporal limitations. United States v. Myers, 308 F.3d 251, 266-67 (3d Cir. 2002) (finding that a search of defendant's duffel bag located three feet from the location of defendant's arrest was impermissible because defendant was arrested and presented no danger, noting that courts should not assume that a defendant was "an acrobat" or "a Houdini" in evaluating whether he had access to weapons or evidence).

In the context of a search incident to the arrest of driver or occupant of an automobile, the Supreme Court has established that a contemporaneous search incident to an arrest may extend to the entire passenger compartment of the vehicle, as well as "the contents of any containers found within the passenger compartment." New York v. Belton, 453 U.S. 454, 460 (1981). In a recent case, the Court clarified and arguably extended the reach of Belton by upholding the search of a vehicle even where the arrestee had already exited the vehicle and manifestly had no access to weapons or other

evidence that might be located in the car. Thornton v. United States, 124 S. Ct. 2127, 2129 (2004).[2]

The primary issue in Thornton was whether the rule enunciated in Belton may be extended to situations where an officer first makes contact with an arrestee after the arrestee has already exited the vehicle. Id. However, in the course of upholding the search at issue, the majority held that:

> It is unlikely in this case that petitioner could have reached under the driver's seat for his gun once he was outside of his automobile. But the firearm and the passenger compartment in general were no more inaccessible than were the contraband and the passenger compartment in Belton. The need for a clear rule, readily understood by police officers and not depending on differing estimates of what items were or were not within reach of an arrestee at any particular moment, justifies the sort of generalization which Belton enunciated. Once an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment.

Id. at 2132.

Applying the foregoing cases to the instant dispute, the Court cannot agree with the government's argument that the circumstances of the search in this case comport with the physical and temporal requirements discussed in Chimel and Myers. The undisputed testimony established that the backpack was located approximately fifteen feet from Defendant's vehicle at the time of the arrest. In Myers, the Third Circuit found that the search of a duffel bag located a mere three feet from an arrested defendant was unlawful. 308 F.3d at 266-67. As in Myers, Defendant was in custody and had no access to the backpack that would have justified a protective search. Accordingly, the Court finds that

---

[2] Indeed, in Thornton the search of defendant's vehicle was not conducted until after defendant had been arrested and secured in the back seat of the patrol car. 124 S. Ct. 2127, 2129 (2004).

the search was not conducted incident to Defendant's arrest within the limits contemplated by Chimel and Myers.

Alternatively, the government contends that the search was lawful under the reasoning of Belton and Thornton as a search of a vehicle incident to the arrest of the vehicle's driver or occupant. In this regard, the government argues that Thornton would justify the search of the backpack, even though the backpack was located approximately fifteen feet away from the vehicle at the time of Defendant's arrest. This argument is unpersuasive. First, the government's position that the backpack "was in the span of the area generally within the defendant's immediate control" strains credibility. (Doc. No. 82, at 14). Second, the government's argument ignores the Third Circuit's clear indication in its remand Order that Belton and other "car" cases are not automatically controlling under the circumstances in this case. Sinkler, 91 Fed. Appx. at 232 n.9. Indeed, the Third Circuit stated unequivocally that:

> [We] are unaware of any cases binding on us that extend the scope of a search incident to the arrest of a defendant in his vehicle to include items found beyond the passenger compartment of that vehicle.

Id.

It is undisputed that Defendant's backpack was no longer a part of the vehicle's contents at the time of the arrest, as it was apparently ejected from the vehicle during the last stages of the chase and eventual crash on Interstate 81. This fact alone would appear to render Belton and Thornton inapplicable to this case. Thornton authorizes police to search vehicles and containers therein even where an arrestee exited the vehicle prior to his arrest, and where he has been arrested and secured prior to the search taking place. The Supreme Court justified such searches, at least in part, on the need for a bright line rule authorizing police to search vehicles to ensure their safety and to preserve

evidence. However, the <u>Thornton</u> rule allowing police to search a vehicle and its contents incident to an arrest in order to protect the officers' safety and to preserve evidence does not appear to extend to a search motivated by precisely the same interests where the container to be searched happened to be ejected from the vehicle.[3] The Third Circuit indicated clearly that the rule enunciated in <u>Belton</u> and extended in <u>Thornton</u> does not automatically control the search in this case because the backpack wound up outside of the vehicle following the crash, thereby taking this case outside of the automobile search context. <u>Sinkler</u>, 91 Fed. Appx. at 232 n.9. Accordingly, this Court cannot find that the search of the bag satisfies either the physical proximity and temporal requirements of <u>Myers</u> or <u>Chimel</u>, or that the search is permissible in accordance with the applicable case law governing searches of vehicles incident to the arrest of their drivers or occupants.

    **C.**    **Search Pursuant to an Inventory Policy**

Finally, the government contends that the contents of the backpack should not be suppressed because it is the practice of the Harrisburg Police Department to conduct an inventory search of vehicles and closed containers after the arrested operator of a vehicle is taken into custody. Accordingly, the government argues that the contraband seized pursuant to the warrantless search of the backpack should not be suppressed because it was discovered pursuant to a search conducted in accordance with Harrisburg Police Department's valid inventory policy.

It is well established that police officers may conduct warrantless searches of vehicles and other

---

       [3]    Had the backpack remained in the Jeep after the crash, it is clear that the backpack would be subject to police search under either <u>Belton</u> or <u>Thornton</u> as a closed container located within the vehicle.

property, provided the inventory is conducted in accordance with a written policy or standard procedures. Colorado v. Bertine, 479 U.S. 367, 372 (1987); South Dakota v. Opperman, 428 U.S. 364, 372 (1976) (holding that inventory searches represent a reasonable police intrusion and noting that "'[when] police take custody of any sort of container . . . it is reasonable to search the container to itemize the property to be held by the police'") (quotation omitted). The Supreme Court has held that closed containers may be opened during an inventory search, provided that a policy or established routine governs the search and the inventory is not a ruse to allow the police to rummage for incriminating evidence. Florida v. Wells, 495 U.S. 1, 4 (1990). The requirement that a search of a closed container be conducted pursuant to standardized policy or established routine does not strip an officer of all discretion in determining whether to open a closed container:

> [T]here is no reason to insist that [inventory searches of closed] containers must be conducted in a totally mechanical "all or nothing" fashion . . . a police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment.

Id. Notwithstanding such discretion, however, "the individual police officer [conducting the inventory] must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" Id. (quoting Bertine, 479 U.S. at 376 (Blackmun, J., concurring)). Finally, although inventory searches are constitutionally permissible, "the policy or

practice governing inventory searches should be designed to produce an inventory." Id.

In the instant case, Harrisburg Police Officers Chad Sunday and Christopher Delozier each testified that although the Harrisburg Police Department does not have a specific written policy governing inventory searches of closed containers, it is standard practice among all Harrisburg Police officers to search an arrestee's vehicle and closed containers as part of an inventory search when an arrestee is taken into custody. (Transcript, at 41, 42, 70, 78 and 79). Officer Delozier testified that Harrisburg Police officers conduct inventory searches pursuant to the inventory policy in order safeguard the police from accusations of theft and illegal conduct. (Id., at 80.) Likewise, Officer Sunday testified that items located inside vehicles, as well as closed containers, are opened and examined for valuables in order that a record may be made of such items before the towing company takes possession of the vehicle and removes it from the scene of the accident or arrest. (Id., at 41-42.)

Notwithstanding that both Officers Sunday and Delozier testified that the purpose underlying inventory searches is to create an inventory report and guard against claims of theft and wrongdoing, it appears that the officers searched the backpack in the instant case in order to ensure that the bag did not contain any dangerous items, rather than to conduct an inventory of its contents. For example, Officer Sunday testified that he checked the backpack to make sure that none of the backpack's contents were harmful:

> Q.   Can you tell us whether or not that's your regular practice?
>
> A.   Yeah, that's something we – I normally do, you know, in circumstances like that. I don't know what the contents of that bag contain, and to make sure that there's, again, no valuables or anything that could be left out there, make sure I check the interior of the bag. We don't want to have a gun or anything like that discharge and hurt an officer innocently

>just because we failed to check a bag or a pocket.

(Id., at 70). At another point during the hearing, Officer Sunday testified that he and other officers:

>checked the interior of the bag, made sure there was nothing in there that could harm us. We observed items in there. And then the bag was held in that context, and nothing was removed from the bag until we later went to the station and Officer Lyda and I removed everything from the bag. I completed a property report and logged those items. And that was conducted in the traffic safety office on the first floor of the police station.

(Id., at 68-69.) Officer Delozier offered similar testimony regarding the officers' motivation for opening the backpack at the scene of the arrest:

>Q. Officer Delozier, if you were taking a bag to the police station with unknown contents, is there something that you would do with respect to that bag to ensure your personal safety?
>
>A. I would look inside it to make sure that –
>
>Q. Okay. And that would be to ensure what sort of things weren't inside that bag?
>
>A. Contraband, weapons, looking for identification of the owner.

(Id., at 85-86.)

Based upon the undisputed testimony of Officers Sunday and Delozier, the Court cannot conclude that the search of Defendant's backpack immediately following his arrest was conducted as a standard inventory search. Rather, the Court finds that Officers Sunday and Delozier, and apparently Officer Lyda, opened the backpack to determine, at a minimum, whether the bag contained contraband or anything that could present a danger to the police. Although the Court finds it understandable and eminently reasonable for the officers to have taken such a step to ensure their safety before taking

12

custody of the backpack, that fact alone does not cause such a search to be an "inventory" search. It does not appear that any of the officers were actively inventorying any of the items found at the arrest scene, and neither Officer Sunday nor Officer Delozier persuaded the Court that the reason for conducting the search of the backpack at the arrest scene was to inventory its contents. Indeed, Officer Sunday acknowledged that the backpack and its contents were not inventoried until officers returned to the police station. (Id., 68-69.) In light of such testimony, the Court cannot construe the search of the backpack as an inventorying of its contents. Accordingly, the Court will not uphold the seizure of the narcotics and paraphernalia found in the backpack under the theory that such items were seized during a valid inventory search.

### D.     Inevitable Discovery

Notwithstanding the fact that a search is invalid because it was not conducted incident to an arrest or because it was not conducted as an inventory search, items seized during a warrantless search will not be suppressed if the police would have discovered such items in the normal course of business. Under the inevitable discovery doctrine, evidence that was obtained illegally will not be suppressed "if the government can prove that the evidence would have been obtained inevitably" even if there had been no statutory or constitutional violation. Nix v. Williams, 467 U.S. 431, 444 (1984). The inevitable discovery doctrine has generally been found applicable in the context of obtaining tangible evidence, such as drugs and weapons. United States v. Vasquez de Reyes, 149 F.3d 192, 195 (3d Cir. 1998). It is the government's burden to demonstrate that the evidence seized illegally would have been acquired through lawful means. Id. The government can meet this burden if the government demonstrates that the police, following routine procedures, would inevitably have uncovered the

evidence at issue. Id.  In analyzing whether the inevitable discovery doctrine applies, the focus should be on historical facts capable of verification, rather than speculation. Nix, 467 U.S. at 444 n.5.

In this case, the evidence taken at the September 8, 2004 hearing demonstrated conclusively that the backpack would ultimately have been searched pursuant to an inventory search conducted by the Harrisburg Police Department in accordance with standard and established procedures.  Officers Sunday and Delozier each testified that it is the routine and established practice of all Harrisburg Police officers to conduct an inventory of all vehicles and containers in the possession of arrestees who are taken into custody.  Each officer testified that police officers follow this standardized practice to create an inventory of all items located in a vehicle or closed container in order to protect against claims of theft and wrongdoing.  Indeed, in this particular instance, Officer Sunday testified that after the officers opened the backpack to determine whether it contained dangerous items, the officers took the backpack to the police station where it was in fact inventoried:

> Q. Where did you perform the inventory?
>
> A. Of what?
>
> Q. The bag.
>
> A. The bag?  A look of – We checked the interior of the bag on scene.
>
> Q. Who is we?
>
> A. Officer Lyda, Officer Delozier, and myself checked the interior of the bag, made sure there was nothing in there that could harm us.  We observed items in there.  And then the bag was held in that context, and nothing was removed from the bag until we later went to the station and Officer Lyda and I removed everything from the bag.  <u>I completed a property record report and logged those items</u>.  And that was conducted in the traffic safety office on the first floor of the police station.

(Transcript, at 68-69) (emphasis added). Officer Sunday's testimony in this regard corroborates his and Officer Delozier's testimony that it is the regular practice and policy of the Harrisburg Police Department to conduct an inventory of closed containers when such containers are taken into custody. Accordingly, this testimony bolsters the Court's finding that had the police not initially opened the backpack for their safety prior to leaving the arrest scene, the police would have inventoried the bag upon their return to the police station. In fact, as discussed, such an inventory was actually conducted. Because the Court finds that the backpack would inevitably have been inventoried along with the other items confiscated at the arrest scene pursuant to established inventory policy and practice, the narcotics and paraphernalia seized from the backpack will not be suppressed.

### III. Order

And now, this 23rd day of November 2004, **IT IS HEREBY ORDERED THAT** Defendant's Motion to Suppress (Doc. No. 14) is **DENIED.  IT IS FURTHER ORDERED THAT** Defendant's Motion in Limine (Doc. No. 84) filed in connection with this matter is **DENIED** as moot.

                                                  S/ Yvette Kane
                                                  Yvette Kane
                                                  United States District Judge